UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                    Plaintiff,

                                           <u>Memorandum & Order</u>

     -against-                            CR-04-0489 (JMA)

YOCHANAN COHEN,

                    Defendant.
-----------------------------------------------------------X

A P P E A R A N C E S:

Roslynn R. Mauskopf
United States Attorney
Eastern District of New York
One Pierrepont Plaza
Brooklyn, NY 11201
        By:    Shannon C. Jones
               Assistant United States Attorney

Alan S. Lewis, Esq.
Buchanan Ingersoll PC
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005-1417
Attorney for Defendant


AZRACK, United States Magistrate Judge:

      Defendant moves to suppress statements made to law enforcement officers before and after his

arrest in the above matter on the ground that the statements were obtained by unlawful custodial

interrogation in violation of defendant's <u>Miranda</u> rights. A hearing on the motion was held on March 10

and March 22, 2005. I conclude that defendant's constitutional rights were violated by his unwarned

custodial interrogation, and therefore his unwarned statements must be suppressed. Subsequent

<u>Miranda</u> warnings administered to defendant, however, were effective in conveying to defendant his

rights, and therefore his motion to suppress post-warning statements is denied.

# I. BACKGROUND

Defendant Yochanan Cohen is charged in a one count information with engaging in sexual contact with another person without that other person's permission. See 18 U.S.C. § 2244(b) (2005). The charge arises from defendant's conduct on a flight from Salt Lake City to New York City's John F. Kennedy Airport on April 10, 2004. Defendant put his hand on the leg of the woman sitting in the seat next to him and moved his hand up her leg, under her skirt and touched her underwear. The woman thereafter changed seats and alerted the flight crew. The passengers were told over the public address system that, when the airplane landed, they had to remain in their seats for security reasons. Officers David Lim, Shirley Smith and Sergeant Richard Alymer of the Port Authority Police Department ("PAPD") met the flight at the airport.

PAPD Officer David Lim testified that he was told by the desk officer that a problem, something sexual, had occurred on an incoming flight. Lim understood this to mean that a possible sexual assault had occurred. He told Sergeant Alymer, and they went to the gate, accompanied by Officer Smith. Lim testified that when the flight arrived, at 5:30 am, he told a flight attendant to warn the passengers not to leave their seats. Passengers had been previously warned to remain in their seats until further notice because of a security situation.[1] Officer Smith boarded the aircraft and escorted

---

[1] The parties stipulated to the content of the public address announcement. They agreed that an announcement made when the plane landed at the airport warned the passengers that there was a security issue, and that the passengers were required to remain seated until the security issue could be resolved.

defendant's former seatmate, the complaining witness, off of the plane. Lim and Alymer then questioned the complaining witness about the incident. She told them that defendant had touched her leg and moved his hand up her skirt to her underwear. The complainant told defendant no after the first time he touched her but did not alert the flight crew. Defendant stopped touching her when a flight attendant approached. He fell asleep, and upon his waking up, some 15 or 20 minutes later, defendant did the same act. The complaining witness therefore left her seat. She told the officers that she wanted to file a complaint.

After interviewing the complainant, Lim boarded the aircraft with the flight attendant. The flight attendant pointed out defendant, and Lim went over to defendant and escorted him off the plane. Lim testified that he had no conversation with defendant while removing him from the plane; Lim simply gestured for defendant to follow him, a request with which defendant complied. Defendant took with him his carry-on bag. Lim did not touch defendant. Lim took defendant about 10 or 15 feet away from the door of the plane. This was about one-quarter of the way down the jetway, which Lim estimated was 60 feet in length.[2] Present in the jetway was an airline security officer, about midway between the airplane and the terminal. Lim testified that he and Sergeant Alymer were the only law enforcement personnel present for defendant's questioning.[3] The flight attendant waited at the door of

---

[2] The jetway is the enclosed passageway, or tunnel, leading from the aircraft to the terminal.

[3] PAPD Officer Brian Nagle was directed to the terminal by his superiors to pick up and transport defendant to the precinct. Officer Nagle testified that when he arrived at the gate, he walked about halfway up the jetway. From there, perhaps 20 feet away, he observed Alymer and Lim talking to defendant. Within one minute of Nagle's arrival, defendant had been arrested and handcuffed by Alymer and Lim. Nagle did not notice any other officers or security personnel in the jetway.

the airplane during the interview.

Alymer asked defendant what had happened. Defendant proceeded to describe his actions. While in flight, there was some contact between himself and the complainant. The complainant did not, according to defendant, complain about his touching her leg. Defendant had his hand on the complainant's leg until a flight attendant passed by. Defendant fell asleep for about 15 minutes, and when he awoke started to touch the complainant again. She then took out her purse, applied cosmetics and left her seat. Lim testified that defendant stated that he did not think anything of the complainant's leaving. Defendant made his statement in a narrative form, and Lim testified there was no need to interrupt defendant's recounting. Defendant did not say that the complaining witness had objected to his touching of her leg. Lim testified that neither defendant nor Alymer were agitated during this conversation; defendant was fairly calm. Lim observed that defendant understood questions in English and Lim understood defendant.

After the conversation, which lasted about 5 to 10 minutes, Alymer ordered Lim to place defendant under arrest. Lim testified that prior to hearing defendant's story, no decision had been made as to whether to arrest defendant or not. That is, Lim and Alymer wanted to hear defendant's side of the story. During the interview, the officers' hands were not on defendant and while their weapons were apparent on their hips, the weapons were not drawn. Alymer told Lim to summon Officer Nagle to transport Lim and defendant to the precinct. Defendant was driven to the precinct in a marked car. The trip took about 10 minutes. There were no conversations between defendant and the officers on the ride to the precinct.

Defendant was placed alone in a holding cell at 6:10 am, about forty minutes after the plane had

landed. While defendant was in the cell, Lim alerted the Federal Aviation Administration and the Federal Bureau of Investigation ("FBI") of defendant's arrest. Lim testified that he did so because the crime allegedly had been committed in federal airspace, and thus federal agencies would likely have jurisdiction. When Lim called the FBI, he spoke to Special Agent Robert Ward. Lim did not remember what he told Ward or whether he asked Ward if the PAPD ought to interview or refrain from interviewing defendant.

PAPD Detective French Pearson arrived in the holding area and asked Lim what happened. Lim told Det. Pearson that a suspect was in their custody that had allegedly inappropriately touched a woman on an incoming flight. Pearson requested to speak with defendant. Lim did not tell Pearson the content of Lim's interrogation of defendant before Pearson began his interrogation of defendant. Lim did not know whether Pearson spoke with the complainant or with Alymer before Pearson spoke with defendant. Lim told Pearson to read defendant his rights. Lim and Pearson went over to the holding cell, and from outside the cell, administered to defendant his <u>Miranda</u> warnings. Defendant responded that he understood the warnings. Defendant was asked to sign the rights card, which he did, after which Pearson signed it as well. Lim testified that defendant did not ask for a lawyer. Lim denies telling defendant that this was not serious or not a big deal and that defendant did not need a lawyer. Lim further denies telling defendant that women often change their minds about "these" complaints. Lim did not discuss defendant's statement with anyone before he and Pearson interviewed defendant.

With Lim at his side, Pearson asked defendant to tell the officers what had happened. Defendant began talking and reiterated what he had earlier told Lim and Alymer. He stated that he moved his hand so far up the complainant's leg that he could see her underwear, which were white.

Lim stated that this interview lasted about 10 minutes, and defendant recounted basically the same statement he had made to Lim and Alymer.

On cross examination, Lim stated that from the complaining witness's description of the incident, the police had enough information to arrest defendant. But Lim said that since there are always two sides to a story, the officers wanted to give defendant an opportunity to tell his side. Lim admitted that defendant would not have been permitted to leave the jetway if he had refused to speak. Rather, if defendant did not speak to the officers, he would have been arrested. Defendant, according to Lim, thus had no choice but to answer the officers' questions. Lim did not think to Mirandize defendant on the jetway before he and Alymer began their interrogation. Lim did not, however, tell defendant that he was required to answer the officers' questions. If defendant had told a different story that Lim or Alymer thought warranted asking the complaining witness about, they would have taken his story back to her.

Detective French Pearson also testified at the hearing. Pearson was asked by his lieutenant to assist in interviewing a suspect.[4] Pearson was told by the lieutenant that passengers from an incoming flight had been taken to the precinct. He was further told that defendant had touched someone without her consent. No one told Pearson the content of defendant's statement, and he was not informed of the content of the complaint's statement. Pearson testified that when he and Lim were outside defendant's cell, they read him his Miranda rights and had no other conversation about the necessity of counsel or any topic other than what appeared on the rights card. Pearson testified that defendant

---

[4] This was about 7:00 am on April 10, 2004.

asked no questions before waiving his rights, and that defendant did not seem reluctant to speak with him.

Pearson's conversation with Lim about defendant included a description of how the incident occurred. According to Pearson, he and Lim spoke only briefly. Pearson knew before his interview with defendant that the federal government would become involved and take jurisdiction over the case. Pearson testified that he did not try to determine whether defendant had made any statements to law enforcement officers before interviewing him, and he thus did not know that Alymer had interviewed defendant on the jetway. He testified, however, that based on his experience, he was sure that law enforcement officers had interviewed defendant at the scene.[5]

Pearson also asked defendant what happened on the plane. Defendant told him that his and the complaining witness's elbows and knees were touching, and that he put his hand on her knee and, since she did not stop him, he moved his hand up to her underwear. Defendant told Pearson that he had put his jacket over the area on her lap where he had placed his hand. Defendant then slept for 20 minutes and when he awoke, because his and her knees were still in contact, touched the complainant again. The complainant then moved defendant's hand and left the aisle. Defendant saw the complainant speaking with a flight attendant.

Pearson's interview of defendant also lasted 5 to 10 minutes. Defendant was afterwards removed from his cell and brought to an interview room in the detective's area of the precinct. Once defendant was in the new interview room, at 7:25 am, Pearson asked him if he would be comfortable

_____

[5] Pearson had been a detective for a year and a PAPD officer for sixteen years prior to this incident.

making a written statement. Defendant answered that because he did not write well, he would prefer to write a first draft of any statement on his laptop. Thus, Pearson took defendant into the room next door, a room equipped with electrical outlets, and gave defendant his laptop. Defendant was guarded at this time by an Officer White. White did not speak with defendant. Pearson left the room for about 10 or 15 minutes while defendant wrote out the statement. When defendant had completed a second, hand-written statement, defendant and Pearson signed the statement; this was about 8:40 am. Defendant did not show Pearson what he had written on the laptop. Pearson testified that defendant never asked him the purpose of the statement.

Pearson contacted the United States Attorney's office in Brooklyn and was informed that the federal government would be prosecuting defendant's case. Pearson could not recall at what time he contacted the federal authorities or even if he personally made the contacts. Pearson waited about one or two hours for Special Agent Ward of the FBI to arrive. Pearson had no contact with defendant during this time. When Ward arrived, Pearson briefed Ward on the situation; Pearson told Ward that defendant was brought to the precinct on suspicion of non-consensual sexual contact. Pearson told Ward the contents of defendant's statement, including that it was defendant's understanding that the touching was consensual. Pearson testified that he could not recall whether Ward asked to read defendant's written statement before beginning an interview with defendant.

Pearson took defendant back to the original detective's interview room. There Pearson sat in on another interview of defendant with Special Agent Ward. Ward administered defendant his Miranda warnings. Another PAPD Detective, Det. Kehoe, was also present for this interview. After the Ward/Pearson interview, defendant was taken to central booking.

Special Agent Robert Ward testified that he spoke with Detectives Pearson and Kehoe about defendant's case prior to Ward's interview with defendant. Pearson gave Ward a summary of the incident and defendant's and the complainant's statements. Ward testified that the statement defendant gave Ward was consistent with the summary he heard from Pearson. After administering defendant <u>Miranda</u> warnings, Ward asked defendant if he understood the warnings and if so would he sign the rights card. Defendant would not sign the rights card and instead asked to hear the allegations against him so he could decide if he wanted to speak with an attorney prior to answering Ward's questions. Ward explained the allegations against defendant, that the woman sitting next to defendant on the airplane had complained that he had put his hand under her skirt. Defendant then told Ward that this was not true, and that defendant wanted to tell his version of the incident. Defendant then gave his version of the events to Ward. Defendant said that from the beginning of the flight, his knees and shoulders were in contacted with the complainant's knees and shoulders. Thinking that she might be coming on to him, he put his hand on her leg. He then waited 15 minutes, and reached up and touched her underwear. Seeing a flight attendant approaching, defendant removed his hand. When defendant touched the complainant's leg again, she turned away from him, and then left the seat. Defendant took this to mean that the complainant no longer wanted the touching to go on, and so he stopped. Ward told defendant that defendant's version of the incident did not seem credible to Ward. At that point defendant asked for an attorney and questioning ceased.

Ward testified that as he was later driving defendant to the courthouse, defendant told him that he did not see the incident as sexual, that it was more like a game. Defendant asked Ward if he could pay the complainant restitution, and keep the matter out of the courts. Ward told defendant he could

not, and that since he was arrested, the matter was already in the courts.       Defendant also testified

at the hearing.[6]  On April 10, 2004, he was returning from a business meeting in Idaho.  Defendant

heard an announcement over the public address system that there was a security issue and that

passengers were to remain seated when the airplane landed.

When the aircraft landed, defendant, from his seat near the front of the airplane, watched as an

officer boarded the plane and escorted the complainant off of the aircraft.  He also noted another

officer at the door of the airplane.  He testified that he knew then that the security situation mentioned in

the public address involved him.

According to defendant, Lim approached defendant and asked if he was Yochanan Cohen.

Defendant answered that he was and Lim motioned with his hand for defendant to follow him.

Defendant asked if he could take his luggage, and Lim then looked around and said yes.  Lim then took

defendant to right near the door of the airplane.  Defendant testified that he requested that they move

further into the jetway so as not to be in the sightline of any of the passengers.  The officers then took

defendant a little further into the jetway.  Defendant testifies that he remembers seeing several more

---

[6] Defendant is 42 years old, married, and owns a corporation, HighCom Security, Inc., which
sells security products and services to private business, law enforcement, the military, and other
government agencies and entities.  Before he founded HighCom Security, defendant was in the Israeli
Special Forces as a soldier and officer, then joined the Israeli Secret Service, and then joined the Israeli
Foreign Ministry as Vice Consul at the Israeli consulate in San Francisco.  Defendant testified that his
English language skills are average, but that he sometimes uses inappropriate or incorrect wording.
Prior to this incident, he has never been arrested or charged with any crime, never been civilly sued,
and no one has ever made any sexual complaints against him.  Defendant's wife is a college professor.

Defendant maintains residences in New York City and San Francisco.  Prior to this incident, he
was a biweekly traveler between New York and San Francisco, and traveled for business
approximately one additional time each month.

officers in addition to Lim.  He saw some men without uniforms and assumed they were detectives.

Defendant was approached by a large officer in sunglasses, who asked him what happened on the plane.  Defendant asked regarding what, and Alymer, the large officer in sunglasses, told defendant that the woman sitting next to him had complained that defendant had touched her without permission.  Defendant said that this was not true, that defendant had permission to touch her.  He told Alymer he did nothing wrong.  Defendant testified that he still thinks he did nothing wrong.  Defendant testified that he and the woman next to him had been touching each other for an hour and half, and had touched many times.  He testified that he told the officers at the precinct that he and his seatmate had been touching each other and that she had touched him.

Defendant testified that he answered the officer's questions on the jetway because he had to.  He considered himself arrested and in custody at the time he was removed from his seat.  He saw no option but to comply with the officers' requests.  Defendant felt that he had to do what the officers told him based on how they approached him, their manner towards him, and how they were acting.  Defendant described the body language of the officers as being in "an alert position."  The message over the public address system played a part in how defendant perceived the situation as well; he knew he had to remain seated when the plane landed.

Defendant testified that from his cell, he could see Lim speaking with Pearson, but defendant could not hear their voices.  After defendant had been in the cell for approximately one half hour, Lim and Pearson approached defendant.  Sometime while Lim and Pearson were informing defendant of his rights, Kehoe also arrived.  Defendant testified that when he was told he had the right to an attorney, he asked the officers whether he needed an attorney.  Pearson replied, shrugging, that if he had nothing to

hide, he likely did not need an attorney.

Defendant had a conversation with the officers about defendant's law enforcement and security background. He told them that he was not a criminal, that he had never forced himself on anyone in his life, and that he was not a sex offender. He expressed disbelief that after all the time he had sat next to complainant that she would make a complaint against him. Defendant testified that Pearson told defendant that women sometimes change their minds. After asking for and receiving a glass of water, defendant was taken into a small interview room with a table and some chairs.

In the interview room, Pearson told defendant that he wanted defendant to write out a statement. Defendant testified that when he asked the purpose of a written statement, Pearson told him, pointing at defendant with pointer fingers extended on both hands, that it would help defendant later on. Defendant asked to type his statement as he was more comfortable typing than writing. Pearson took defendant into an office next door to the interview room, where defendant typed and then wrote out the statement. Ward was in the interview room when defendant returned to it after writing the statement.

Pearson and possibly Kehoe were present when Ward questioned defendant. When Ward administered defendant his Miranda warnings, defendant asked whether he needed a lawyer. Ward told defendant it was up to him. Defendant testified that he answered Ward's questions because he had already told the officers and detectives everything and thought that his fortunes may be improved if he cooperated. After all, defendant testified, Pearson told him that the arrest was not a big deal and reminded defendant that he had already spoken to the officers.

On cross examination, defendant testified that he was familiar with law enforcement through his business, that he regularly meets with law enforcement officials. Defendant testified that he asked

Pearson, during the administration of his <u>Miranda</u> warnings, whether he needed a lawyer. He testified that Pearson replied with the question of whether defendant thought he needed a lawyer. Defendant replied that he was asking the detective, given that the detective was in a better position to know the answer. Pearson, shrugging, and motioning with his hands that it was up to defendant, told him that if you have nothing to hide, then you do not need a lawyer.

Finally, defendant testified that while being transported from the airport to the courthouse, he said to Ward that defendant was willing to pay the complainant, that he had been stupid, that the incident "was a game;" defendant also expressed concern over what he would tell his wife, and lamented that the incident was only "an hour and a half."

The above factual scenario raises <u>Miranda</u> issues in the context of a three-part interrogation of defendant: i) his questioning by PAPD officers on the jetway leading to the terminal (the "jetway questioning"); ii) his questioning by PAPD Detective Pearson at the precinct (the "local police questioning"); and iii) his questioning by Special Agent Robert Ward of the FBI (the "FBI questioning"). Defendant argues that all of the statements made to law enforcement officers should be suppressed. He argues 1) that because he was in custody on the jetway, statements made during the unwarned jetway questioning must be suppressed; 2) that because he was tricked by law enforcement into believing that he did not need a lawyer, statements made during the local police and FBI questioning must be suppressed; 3) that because <u>Miranda</u> warnings were administered only in the middle of his interrogations, they did not effectively warn him of his right to refuse to speak, and this provides alternative grounds for suppressing statements made during the local police and FBI questioning; and 4) that the taint from the unconstitutional interrogations remained at the time defendant

made spontaneous statements to law enforcement, and therefore those statements must be suppressed as well. The government argues that defendant was not in custody when being questioned on the jetway, and therefore statements made during the jetway questioning are admissible. Also because defendant was not in custody during the jetway questioning, the government argues that as there was no <u>Miranda</u> violation, statements made after defendant was administered warnings and spoke to law enforcement during the local police and FBI questioning are admissible as well. The government further argues that there was no evidence of deception or trickery of the type to undermine defendant's will during the local police and FBI questioning, and thus deception or trickery does not lie as a separate ground for suppression. Lastly, the government argues that there is no theory of law upon which to base suppression of the spontaneous statements made by defendant on the ride to the courthouse.

## II. SUPPRESSION OF DEFENDANT'S STATEMENTS

The first issue is whether defendant was in custody during the jetway questioning. The second is if so, were the warnings given at the police precinct effective in conveying to defendant his constitutional rights in light of the earlier unwarned questioning. If the mid-interrogation warnings protected defendant's rights, the subsequent confessions are voluntary and admissible. This case also presents a third issue, whether the conduct of the local police amounts to trickery or deception rendering defendant's waiver of his rights involuntary.

### A. <u>Defendant was "in custody" During the Jetway Questioning</u>

A suspect is entitled to <u>Miranda</u> warnings when subjected to custodial interrogation. <u>Miranda</u>

v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Custody "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2148, 158 L. Ed. 2d 938, 950 (2004). The Supreme Court in Yarborough v. Alvarado quoted Thompson v. Keohane, 516 U.S. 99 (1995), for the current Miranda custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.

Yarborough v. Alvarado, 124 S. Ct. at 2149, quoting Thompson v. Keohane, 516 U.S. at 112.

Four days before the Supreme Court decided Yarborough, the Second Circuit decided United States v. Newton, 369 F.3d 659 (2d Cir. 2004). Newton took the "opportunity to clarify how the free-to-leave test referenced in [Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir. 1998)] and the coercive-pressures test articulated in [United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987)] both serve to identify circumstances requiring Miranda warnings." Newton, 369 F.3d at 670.

The free-to-leave test is quite similar to the Thompson v. Keohane test:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir.1998), quoting United States v. Kirsh, 54

F.3d 1062, 1067 (2d Cir. 1995).  The "coercive-pressures" test is met, and Miranda warnings

required, where the questioning is "conducted in custodial settings that have inherently coercive

pressures that tend to undermine the individual's will to resist and to compel him to speak."  Newton,

369 F.3d at 669, quoting United States v. Morales, 834 F.2d at 38.[7]

The Second Circuit's custody test clarification is basically aligned with the Supreme Court's

own description of the test in Yarborough.  Newton requires a court to make a free-to-leave inquiry

first, but recognizes that the "'ultimate inquiry' is the arrest/arrest-like restraint test established by

California v. Beheler, 463 U.S. [1121, 1125 (1983)]."  Newton, 369 F.3d at 672.

"Miranda's focus is on the facts known to the seized suspect and whether a reasonable person

would have understood that his situation was comparable to a formal arrest."  Id. at 675.  A suspect

might consider his situation comparable to a formal arrest where he recognizes that

"his detention [is] not likely to be temporary and brief" and under the circumstances "feel[s] that he [is]

_____

[7] The full Morales test is whether the questioning was

(1) conducted in custodial settings that have inherently coercive pressures that tend to
undermine the individual's will to resist and to compel him to speak (the in custody
requirement) and (2) when the inquiry is conducted by officers who are aware of the
potentially incriminatory nature of the disclosures sought (the investigative intent
requirement).  Only questioning that reflects a measure of compulsion above and
beyond that inherent in custody itself constitutes interrogation the fruits of which may be
received in evidence only after Miranda warnings have been given.   The questions
asked must have been both likely to elicit an incriminating response and to produce
psychological pressures that will subject the individual to the "will" of his examiner.

Morales, 834 F.2d at 38 (citations omitted).  The government apparently concedes the second prong,
that defendant was being questioned by officers aware of the potential nature of the disclosures.

completely at the mercy of the police." Id., citing Berkemer v. McCarty, 468 U.S. 420, 437, 438 (1984).

Defendant was in custody under the Supreme Court and Second Circuit tests. First, in contemporary society, and especially in the heightened security atmosphere of airline travel, no one hearing that all passengers must remain seated upon arrival due to security concerns believes they should do anything other than listen closely to the authorities and follow instructions. Defendant heard this admonition. He then watched the complainant escorted off of the airplane by police officers. He right then would have thought that he was in trouble, and his belief corroborated when he was singled out and escorted off the airplane by police and before the other passengers. Faced with officers in the enclosed jetway who asked him about the incident with the complainant, he would not have felt free to leave. Defendant testified that the officers were in an "alert position," that is, he interpreted the body language of the officers to be communicating a readiness to respond to any situation. Officer Lim testified that defendant was, in fact, not free to go. Lim testified that if defendant had refused to answer questions, he would have been arrested. While Lim did not so threaten defendant, it seems fair to say that Lim's and Alymer's actions could have reasonably been read by defendant as exerting coercive pressures. Airports are different than streets with respect to feeling free to leave or coercive pressure. Had this same interrogation taken place on the street, and not in an enclosed, 60 foot tunnel, with no escape routes or ability to leave, my conclusion as to custody might be different. Defendant could not get back on the airplane and could not tell the officers he was ending the interview and going into the terminal.

Second, defendant's seizure by the police involves restraints associated with formal arrest.

17

Along with the other passengers, defendant was informed that he must remain in his seat due to security concerns. He was pointed out by the flight attendant and removed from his seat on the airplane by a uniformed police officer. He was questioned by police for 5 to 10 minutes. There was no reason for him to think that his detention would be brief. Lim testified that the passengers would have to wait no matter how long the interview lasted. Defendant had seen the complainant, the only witness to the incident, leave with a police officer. A reasonable person in defendant's situation would have considered himself at the mercy of the police. Again, anyone who travels by air knows that they are at the mercy of the authorities when flying. And while it is a close question in this case, it is simply true that airplanes and airports involve heightened security in which an individual's freedom of movement can be curtailed in a way similar to an arrest.

Given the circumstances, a reasonable person in defendant's situation would have felt at the mercy of the police. I conclude that defendant was in custody during the jetway questioning. Because he was not warned of his rights, statements made during the jetway questioning must be suppressed.

B. Defendant's Miranda Waiver Before the Local Police Questioning was Effective in Safeguarding his Constitutional Rights.

The next issue is whether the warnings administered to defendant at the precinct could be effective to safeguard his rights. This question arises because of the Supreme Court's decision in Missouri v. Seibert, __ U.S. __, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (June 28, 2004). There, the Supreme Court addressed the practice of police interrogation of suspects in successive unwarned and warned phases. Seibert, 124 S. Ct. at 2609.

The plurality in Seibert held unconstitutional a two-part interrogation, suppressing statements made both before and after a suspect was administered Miranda warnings. The first round consisted of questioning where Miranda warnings were intentionally withheld. Once the suspect had made incriminating statements, she was administered warnings. She thereupon waived her Miranda rights, and her interrogator took her back through her incriminating statements. The Court thought that "this question-first tactic effectively threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted." Seibert, 124 S. Ct. at 2613. "The threshold issue when interrogators question first and warn later is [] whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Id. at 2610.

The Supreme Court had addressed similar situations in the past. The police in Oregon v. Elstad, 470 U.S. 298 (1985), had gone to the suspect's house to arrest him for a burglary. While in the house, one officer asked Elstad why he thought he was being arrested while the other explained to Elstad's mother that Elstad was a robbery suspect. Elstad answered the officer that he knew the owners of the home in which the burglary had occurred, and added that he knew the house was robbed, and that he had been at the robbery. The Supreme Court thought that this "brief" encounter, which only occurred because the officer's partner wanted to explain the situation to Elstad's mother, did not remove Elstad's ability to later confess to the crime. Elstad, 470 U.S. at 315. Elstad did confess, an hour later at the police station, after warnings were administered. Id. at 301. The Court found that failure to administer Miranda warnings to Elstad at the house was an oversight. Id. at 315. Subsequent warnings, the Court held, would ordinarily lead to a presumption that statements made after those warnings were voluntary. Id. at 315 (as long as unwarned statements are suppressed, "[n]o

19

further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver").

Seibert, by contrast, was intentionally deprived of warnings, as admitted by the officer in charge of the interrogation.  Seibert, 124 S. Ct. at 2606.  Seibert was questioned at the police station for 30 to 40 minutes without warnings until she confessed.  After being given a 20 minute coffee break, Seibert was administered warnings and again asked the same questions; she then made the same admission. Id.

The Seibert Court had to distinguish the questioning defendant Seibert endured from that in Elstad because the Elstad Court would not find that a

> a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Elstad, 470 U.S. at 309.

The Elstad Court held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."  Id. at 318.  The Seibert plurality pointed out that "[a]lthough the Elstad Court expressed no explicit conclusion about either officer's state of mind, it is fair to read Elstad as treating the living room conversation as a good-faith Miranda mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally."  Seibert, 124 S. Ct. at 2612.  The Seibert plurality's reply to Elstad is that

> [i]n a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the Miranda warnings given could reasonably be found effective. If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate Miranda warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.

Seibert, 124 S. Ct. at 2610 n.4. The plurality identified

> a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 124 S. Ct. at 2612.

Five justices agreed that warnings given midstream may be ineffective to safeguard the rights of a questioned suspect. Seibert, 124 S. Ct. at 2613 ("Because the question-first tactic effectively threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible"). Justice Kennedy concurred in the result, but insisted on "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Seibert, 124 S. Ct. at 2616 (Kennedy, J., concurring). He thought that

> [t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example,

a substantial break in time and circumstances between the prewarning statement and
the <u>Miranda</u> warning may suffice in most circumstances, as it allows the accused to
distinguish the two contexts and appreciate that the interrogation has taken a new turn.

<u>Id</u>.  Justice Kennedy advocated another curative measure: "an additional warning that explains the likely

inadmissibility of the prewarning custodial statement[.]"  <u>Id</u>.

    <u>Seibert</u> must be read according to <u>Marks v. United States</u>, 430 U.S. 188 (1977): "When a

fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five

Justices, 'the holding of the Court may be viewed as that position taken by those Members who

concurred in the judgments on the narrowest grounds.'"  <u>Marks</u>, 430 U.S. at 193, <u>quoting</u> <u>Gregg v.</u>

<u>Georgia</u>, 428 U.S. 153, 169 n.15 (1976).  <u>See</u> <u>United States v. Stewart</u>, 388 F.3d 1079, 1086-87

(7th Cir. 2004) (conducting a <u>Marks</u> analysis and determining that the narrowest grounds were those in

Justice Kennedy's opinion).

    I disagree with courts which have found Justice Kennedy's concurrence to be the narrowest

grounds for the judgment, and do not consider the concurrence controlling.

    The Second Circuit has recognized that the <u>Marks</u> rule only works

in instances where one opinion can meaningfully be regarded as "narrower" than
another – only when one opinion is a logical subset of other, broader opinions, that is to
say, only when that narrow opinion is the common denominator representing the
position approved by at least five justices.  When it is not possible to discover a single
standard that legitimately constitutes the narrowest ground for a decision on that issue,
there is then no law of the land because no one standard commands the support of a
majority of the Supreme Court.

<u>United States v. Alcan Aluminum Corp</u>., 315 F.3d 179, 189 (2d Cir. 2003) (citations omitted).

The <u>Seibert</u> opinion is a situation where no "single standard legitimately constitutes the narrowest

ground for decision."  <u>Id</u>.  Justice Kennedy's rule cannot be the narrowest incarnation of the <u>Seibert</u>

rule, because the plurality explicitly refused to rely on the subjective intent of the officer in making its

determination. <u>Seibert</u>, 124 S. Ct. at 2613 n.6 ("Because the intent of the officer will rarely be as

candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the

focus is on facts apart from intent that show the question-first tactic at work"). The <u>Seibert</u> dissenters

also refused to inquire into the intent of the officers. <u>Id</u>. at 2617 ("The plurality's rejection of an intent-

based test is also, in my view, correct. . . . Because voluntariness is a matter of the suspect's state of

mind, we focus our analysis on the way in which suspects experience interrogation") (O'Connor, J.,

dissenting). The plurality thought it possible to ignore the subjective intent of interrogating officers and

still suppress warned statements. <u>Seibert</u>, 124 S. Ct. at 2613 ("by any objective measure [the facts]

reveal a police strategy adapted to undermine the <u>Miranda</u> warnings"). Justice Kennedy would

conduct a separate inquiry into whether warnings were deliberately withheld and then review any

curative measures taken. <u>See id</u>. at 2616 (Kennedy, J., concurring) ("[The plurality's] test envisions an

objective inquiry from the perspective of the suspect, and applies in the case of both intentional and

unintentional two-stage interrogations. In my view, this test cuts too broadly"). Justice Kennedy's rule,

rejected by a large majority of the court, cannot be Seibert's holding. <u>See United States v. Rodriguez-

Preciado</u>, 399 F.3d 1118, 1141 (9th Cir. 2005) (Burzon, J., dissenting) ("As I read it, . . . <u>Marks</u> does

not prescribe the adoption as governing precedent of a position squarely rejected by seven Justices");

<u>see also Alcan Aluminum Corp</u>., 325 F.3d at 189.

  Justice Kennedy's opinion cannot be the narrowest for another reason. Justice Kennedy laid

out an analysis which is "simply different" than that articulated by the plurality, not a logical subset. <u>See

King v. Palmer</u>, 950 F.2d 771, 783 (D.C. Cir. 1991) (en banc); <u>see also Seibert</u>, 124 S. Ct. at 2614

(Kennedy, J., concurring) ("While I agree with much in the careful and convincing opinion for the plurality, my approach does differ in some respects, requiring this separate statement").  A finding that Miranda was undermined, as the plurality did, based on a review of factors, is different than Justice Kennedy's undeveloped analysis into the interrogator's specific intent.  A multifactor test which applies in the case of both intentional and unintentional two-stage interrogations is different than an analysis which looks first whether the intent of the officers was to circumvent Miranda and then goes on to review curative measures, but only in those cases where deliberate intent is found.[8]  See Seibert, 124 S. Ct. at 2616 (Kennedy`, J., concurring) ("Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity").

The aims of the analyses are similar, but neither a logical subset of the other.  There is no doubt that evidence of a subjective intent to undermine Miranda, if available, could figure into the factors the Seibert Court used to distinguish Elstad.  And in some sense, a deliberate–that is, understood as a subjective intent on the part of the officers to do so–attempt to undermine Miranda is a "logical subset" of the larger group of circumstances in which a post-warning statement could be rendered involuntary.

_____

[8] Justice Kennedy and the plurality agreed on the value of an additional warning that prior unwarned statements may be inadmissible.  Justice Kennedy said the additional warning "may be sufficient" to make midstream Miranda warnings effective.  Seibert, 124 S. Ct. at 2616 (Kennedy, J. concurring).  The plurality thought that leaving out the warning "blunts the efficacy" of the midstream warning.  Id. at 2613 n.7 ("We do not hold that a formal addendum warning that a previous statement could not be used would be sufficient to change the character of the question-first procedure to the point of rendering an ensuing statement admissible, but its absence is clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation").  The plurality condemned the police for saying "nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited."  Id. at 2612.

But as discussed above, an inquiry into specific intent is different than an objective review of multiple factors. The Marks methodology reviews splintered opinions to determine whether any of the grounds for the result are a logical subset of other grounds, not whether a result is within a larger category of results.

Only a recognition that deliberate circumvention of Miranda is unconstitutional, but for different reasons and after separate analyses, binds the plurality and Justice Kennedy's concurrence. In this situation the Second and D.C. Circuits say that the only holding is the specific result. See Alcan Aluminum, 315 F.3d at 189 ("The only binding aspect of such a splintered decision is its specific result"); King v. Palmer, 950 F.2d at 784.

What, then, was the Seibert result? A fair characterization is that Elstad does not control all situations of question-first interrogations; that sometimes warned confessions related to previous unwarned confessions must be suppressed. This characterization leaves out how the court arrives at such a conclusion, because the plurality's and Justice Kennedy's analyses are not the same, and thus there is no agreement on all the "analytically necessary portions" of the opinion. See King v. Palmer, 950 F.2d at 783. I am left to devise a test to determine whether to suppress statements made in a question-first situation, in other words, to determine whether midstream Miranda warnings could be considered effective.

Curative measures can be considered within the plurality's framework. Thus, the test for whether subsequent statements can be admitted at trial looks at the circumstances to determine "whether Miranda warnings delivered midstream could be effective enough to accomplish their object[.]" Id. This test considers the five factors enumerated by the Seibert plurality: i) the

completeness and detail of the questions and answers in the first round of interrogation; ii) the overlapping content of the two statements; iii) the timing and setting of the first and the second; iv) the continuity of police personnel; and v) the degree to which the interrogator's questions treated the second round as continuous with the first. Id. Evidence related to the third factor, the timing and setting of the interrogations, can be seen as helping to establish the presence or absence of one of Justice Kennedy's curative measures. See Seibert, 124 S. Ct. at 2616 (Kennedy, J., concurring) (describing "a substantial break in time and circumstances between the prewarning statement and the Miranda warnings" as a curative measure to be considered). Similarly, the last factor, how much the interrogator's questions treated the first and second rounds of questioning as continuous, includes consideration of whether the warnings that were administered included a warning that the statement previously made is inadmissible. A review of the five factors and any curative measures will reveal if Miranda was circumvented, and, therefore, whether a suspect's rights were violated. I address each of the factors below.

The first two Seibert factors are the completeness and detail of the unwarned questioning and the overlapping content of defendant's statements. Officer Lim testified that defendant told Lim and Sergeant Alymer defendant's version of the entire story during the jetway questioning. The jetway questioning was 5 to 10 minutes in length. Lim testified that the statement given to Detective Pearson was substantially the same as the statement given on the jetway. According to both Lim and Pearson, the statement given to Lim and Pearson in the holding cell was also 5 or 10 minutes in length. Lim did not say that any new information was given by defendant to Pearson, except that defendant told them from his cell that he had moved his hand so far up the complaining witness's leg that he could see the

color of her underwear. Pearson did not testify as to the content or duration of Special Agent Ward's questioning of defendant. Ward, however, testified that the information he received from defendant was consistent with the summary given Ward by Pearson. In sum, the jetway questioning produced the complete account of defendant's story; it produced the entire story. This is shown by the fact that the content of the jetway statements and the local police questioning statements are substantially identical. No new or different information was gathered by Ward's questioning of defendant. Defendant testified that the majority of his interview with Pearson was spent describing defendant's law enforcement background, not discussing the alleged crime.

Usually, the more complete and detailed unwarned questions and answers are relative to subsequent warned questions and answers, the more an interrogation is like <u>Seibert</u> than <u>Elstad</u>. That is not the situation here, given the nature of the questioning, the crime, and of defendant's adherence to his story on the jetway, at the precinct, and on the witness stand at the hearing. The only questions that were asked by defendant's interrogators were what happened, which seem to be the only question they could have asked and a perfectly legitimate one in the situation the officers faced. This is not a situation where defendant was the subject of an ongoing investigation into a complex crime, or one where the police had physical evidence of a crime in which he was involved, and tried to utilize such evidence to trap defendant with inconsistencies or break him down with the volume of evidence they had against him. <u>See</u>, <u>e.g.</u>, <u>United States v. Price</u>, No. 04-40035, 2004 U.S. Dist. LEXIS 22220, *12-*13 (D. Kan. Oct. 22, 2004); <u>United States v. Thomas</u>, No. 04-106, 2004 U.S. Dist. LEXIS 26440, *14-*15 (D. Colo. Dec. 16, 2004). The officers on the jetway should have <u>Mirandized</u> defendant before they asked him any questions, and because they did not, statements he made then are suppressed. But I do

not think it improper that defendant's interviewers asked him what happened on the plane. The entire

crime was described by defendant in only a few sentences, and continues to be described by him as a

consensual encounter. The entire crime is consummated by touching a person on her underwear

without her consent. Each of the three interviews were very short; only 5 to 10 minutes. The testimony

is that virtually the only question asked during the jetway and local police questioning was "what

happened?". Lim testified that defendant gave his description of the events in a narrative form, and Lim

saw no need to interrupt defendant's recounting. At the FBI questioning, Ward did not ask defendant

any questions at all; Ward only answered defendant's question about the nature of the charges against

him. There were no pieces of a criminal puzzle to put together by the officers, and no way for

defendant to discuss consent without admitting to the crime. The majority of the statement given by

defendant to Pearson was about defendant's law enforcement background, not about the crime itself.

Under these peculiar circumstances, the fact that defendant gave a complete recounting of the crime in

both the unwarned and warned phases of the questioning, and the related fact that the content of the

statements overlapped, does not tip in defendant's favor.

 The next factor is the timing and setting of the jetway questioning, the local police questioning,

and the FBI questioning. Defendant was questioned by law enforcement as soon as his plane landed,

sometime soon after 5:30 am. He was then immediately arrested and brought to the precinct, arriving

after a brief car ride in his cell by 6:10 am. Around 7:00 am, according to Pearson's testimony,

defendant was questioned by Pearson and Lim in his cell. Defendant was then taken by Pearson to

another interview room, where he was asked to produce a written statement. Pearson testified that by

8:40 am, defendant was signing his handwritten statement, after he had produced a typed statement as

practice for his handwritten statement. Pearson also testified that when Ward arrived, they interrogated defendant a third time.

The jetway questioning was clearly in a different setting than the interviews at the precinct. The second interview was separated from the first by at least one hour; defendant had a break from approximately 6:00 am until 7:00 am between his first two interrogations. During this time defendant witnessed Lim, Pearson, and Kehoe talking and looking at him in his cell. He could not, however, hear what they were saying. Pearson testified that he only asked Lim what was going on and received a brief summary. After making the statement in the cell, defendant was brought to an interview room and asked to make a written statement. Since that room could not accommodate a laptop, he was brought to another room to work on the statement, and then returned to the interview room to sign the statement with Pearson. Defendant finished the written statement by 8:40 am. Defendant testified that Ward was in the interview room with Pearson and Kehoe when defendant returned there from writing out his statement in the next room.

From defendant's perspective, the move from the jetway to the precinct was a new experience. And "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience," Seibert, 124 S. Ct. at 2612. In this case there is evidence of Justice Kennedy's first curative measure, i.e., a substantial break in time or circumstances. The five minute jetway questioning–consisting, again, only of "what happened?"–was separated from the five minute precinct questioning by over an hour. Defendant was allowed to write out a statement on his laptop and then rewrite it by hand, and Pearson left him in the custody of another officer during this time. It seems that writing the statement flowed into defendant's last interview, with Ward, but even that could

have been seen as a new and distinct experience. It likely was, given that Ward did not question

defendant except as to whether he was willing to relinquish his rights, and then only responded to

defendant's inquiry into the charges. Thus, the timing and setting of the unwarned and the warned

questioning favors the government.

The fourth factor, the continuity of police personnel, weighs slightly in favor of defendant.

Alymer and Lim conducted the jetway questioning. Lim and Pearson conducted the local police

questioning. Pearson and Ward conducted the FBI questioning. Someone familiar with defendant's

prior statements was always present at the next interview. Lim could have pointed out any changes to

answers defendant may have made when Pearson questioned defendant. Pearson could have pointed

out any changes to answers defendant may have made when Ward questioned defendant. And

Pearson testified that he had told Ward the content of defendant's statement to Pearson. On the other

hand, Lim never asked defendant any questions at all aside from pedigree information at the precinct.

Defendant only saw Lim directed to arrest defendant and to take him to the precinct. And neither Lim

nor Pearson intervened in the second interviews at which they were present. Given the very short,

single question interviews that occurred on the jetway and in the precinct, a reasonable defendant may

have thought nothing at all of Lim's continued presence. Defendant did not testify that he felt he could

not change his story because the officers were policing his later interviews. Quite the contrary,

defendant testified that he wanted to explain his law enforcement background to the local police and

wanted to tell his side of the story to Ward after hearing the allegations. While there is continuity of

police personnel, in this instance I do not think this factor clearly points to a continuing interrogation of

defendant.

The last factor is the degree to which the interrogator's questions treated the subsequent rounds relative to the first round. What I understand this to mean is how much the interrogator looked to the earlier statements when eliciting later statements. An interrogator can explicitly discuss earlier statements or make it plain that those statements hang in the air over the interview table. Reminders of earlier statements, such as explicit reference to such statements, the presence of an earlier written statement within the defendant's view, or the presence of interrogators who conducted the earlier interviews demonstrate to a defendant that she had previously answered in a certain way to certain questions. In this case, no evidence really reaches this factor that is not discussed within the context of other factors. Both Lim and Pearson testified that they asked defendant what had happened and did not ask him other questions. Defendant might have interpreted their presence as being a means to "police" his later interrogations, and had he made it apparent that he would not make any further statements, the interrogators could have then resorted to explicitly reminding defendant of his earlier statements. But in this peculiar situation, where defendant reiterated a statement which he considers an accurate and exculpatory version of the events on the plane, and which he stood by at subsequent interviews and on the witness stand at the suppression hearing, and which he may well make again on the witness stand at trial, any coercive attributes to continuity are greatly reduced.

Finally, the warnings read to defendant prior to the local police questioning and the FBI questioning did not include a warning that his statements made in the jetway may not be admissible. In the words of the <u>Seibert</u> plurality, there was no way for defendant to overcome the "probable misimpression" that having once answered the questioning of law enforcement officers, there was no use to then refuse to speak. <u>See</u> <u>Seibert</u>, 124 S. Ct. at 2612; <u>see</u> <u>also</u> <u>id</u>. at 2611 ("A more likely

reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision"). Defendant testified that he spoke to the officers in part because he had already told them his story. The additional warning was not utilized in this case, and this weighs in favor of defendant.

There is no evidence that the officers had a subjective intent to undermine and evade <u>Miranda</u>. Reviewing this situation in light of <u>Seibert</u> and <u>Elstad</u>, and given the close question of custody on the jetway, this appears to be a situation where a good faith <u>Miranda</u> mistake was made. Since I found that defendant was in custody, I reviewed the warned and unwarned phases of the interviews to see if the midstream warnings defendant received were effective in safeguarding his rights. I conclude that a review of the factors articulated by the <u>Seibert</u> plurality and Justice Kennedy establish in this case that the midstream warnings were effective, and that therefore statements made by defendant after receiving <u>Miranda</u> warnings and waiving his rights were voluntary and therefore admissible. Defendant was asked very few questions in three very short interviews over three hours. The warnings were adequate to convey to defendant his rights. Defendant's motion to suppress the warned statements must be denied.


C. <u>Deception and Trickery do not Exist as Alternative Grounds for Suppression</u>

Defendant argues that Pearson's conduct during the local police questioning exists as an independent ground to render defendant's <u>Miranda</u> waiver before that questioning involuntary and to render statements made to both Pearson and Ward coerced.

"A confession is admissible under the Constitution only if it is made voluntarily." <u>United States</u>

v. Orlandez-Gamboa, 320 F.3d 328, 332 (2d Cir. 2003). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (internal quotation marks and citation omitted). "Factors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." Id. (internal quotation marks and citation omitted); see Ravello v. Donnelly, 02-CV-5784, 2004 U.S. Dist. LEXIS 7658, *11 (E.D.N.Y. May 3, 2004). The prosecution has the burden of establishing that a suspect's waiver of Miranda and subsequent confession is the product of free choice. United States v. Anderson, 969 F.2d 96, 99 (2d Cir. 1991), citing Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

Defendant is a sophisticated businessman and a former soldier and diplomat. He testified that he has never before been arrested. His security business provides him experience with law enforcement, but no experience as a suspect. Thus, this factor does not point in either direction. The next consideration are the conditions of the interrogation. None of the interrogations have any of the earmarks of coercion. The unwarned questioning was not conducted while defendant was in handcuffs; it was conducted in the most sensible place, right outside the airplane. Defendant, uncomfortable that his interview would be viewed by the other passengers, asked to have the interview conducted further down the jetway, a request with which the officers readily complied. The local police questioning was through the bars of defendant's cell, and defendant was apparently not handcuffed at this point either.

The FBI questioning was conducted at a table in an interview room, and after defendant's request for his laptop had been accommodated. The conditions of the interviews are not coercive beyond that ordinarily associated with custodial interrogations.

The last factor is the conduct of law enforcement. Defendant complains that the Port Authority police misled and tricked him into waiving his Miranda rights and confessing by telling him that if he had nothing to hide, then he did not need a lawyer. Defendant relies on United States v. Anderson for the proposition that deception and trickery can render a confession involuntary. He argues that an interrogator's statement to a suspect that he does not need a lawyer if he has nothing to hide is the equivalent of telling the suspect that "honesty wouldn't hurt him," a phrase found by the Eleventh Circuit to contradict Miranda's admonition that anything the suspect says can be used against him. See Hart v. Attorney General for Florida, 323 F.3d 884, 894 (11th Cir. 2003).

Defendant testified that after being administered Miranda warnings by Officer Lim, defendant asked Lim and Pearson whether they thought he needed a lawyer. The officers responded that if a defendant has nothing to hide, then he probably does not need a lawyer. At the hearing, Pearson denied this conversation occurred; he testified that defendant responded to the local police that he understood his rights and signed the rights card. Defendant testified as follows:

> Q: And at some point in the reading of these Miranda rights, did you say anything other than a yes or no answer in response to their questions?
>
> A: Yes, when they came you have the right for a lawyer, I said "Hold on a second, hold on a second, do I need a lawyer?" And they said to me, "Do you think that you need a lawyer?" And I said, "No, I don't but do you think if I need a lawyer?" Pearson said to me with his hand, he did like because it was also body communication, he said, "Do you have something to hide? If you don't - -" something like that. So, my understanding was if I don't have something to hide, I don't need a lawyer.

Suppression Hearing Transcript, March 22, 2005, at 36.

I am not prepared to find Pearson's testimony not credible.  But assuming the above exchange did occur, it is not unconstitutional deception or trickery.  I agree with defendant that in some cases deception and trickery may rise to a constitutional violation.  The Second Circuit found the misleading statement "if you want a lawyer you can't cooperate," repeated three times to a suspect, to "pose a serious constitutional problem."  <u>Anderson</u>, 969 F.2d at 100.  The court in <u>Anderson</u> thought "deceptive stratagems such as giving false legal advice" would render a waiver and statement involuntary.  <u>Id</u>. at 101.  This idea, that false legal advice renders a waiver invalid, was echoed by the Eleventh Circuit in <u>Hart</u>.  <u>See</u> <u>Hart</u>, 323 F.3d at 894 ("The phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say can be used against you in court'").  The government argues in this case that the phrase "if you have nothing to hide, you don't need a lawyer" does not contradict <u>Miranda</u>'s warning that anything a suspect says can be used against him in court.  Defendant counters that any distinction drawn between "honesty will not hurt you" and "if you have nothing to hide, you don't need a lawyer" would be ludicrous.  I do not want to be the judge that manufactures meaningless distinctions between phrases or that parses a suspect's interpretation of a shrug–a shrug the shrugger denies making.  But is the distinction really ludicrous?  According to defendant, Pearson said "if you have nothing to hide" and then shrugged with palms up; this shrug was understood by defendant to convey the "then you don't need a lawyer" half of the statement.  Yes, the statement and body language might be viewed as misleading in the sense that they entice the suspect to speak with law enforcement, but they are not a misstatement of the law.  For every suspect, "if you have nothing to hide, then you don't need a lawyer" is always true.  An individual that has not committed a crime cannot

35

make incriminating statements. On the other hand, "honesty will not hurt you" is only true for suspects that have not committed a crime, but is always false for those that have. The distinction between these statements, then, is that one is true and is not. And only "affirmative misrepresentations by the police" are prohibited by <u>Miranda</u>, not "ploys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion[.]" <u>Anderson</u>, 969 F.2d at 100, <u>quoting</u> <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990). The combination of "if you have nothing to hide" and a shrug is not an affirmative misrepresentation or misstatement of the law. Thus, I do not find that Pearson's conduct during the local police questioning rendered defendant's statement involuntary on its own, illegally tainting defendant's confessions to Pearson and to Ward.

Finally, when defendant said he wanted a lawyer, for the first time, to Ward, questioning ceased. The law in this area is clear that a question from a defendant to his interrogators asking if they think he needs a lawyer is not an unequivocal request for counsel, and thus questioning was not required to cease until defendant made his unequivocal request. <u>See</u> <u>Diaz v. Senkowski</u>, 76 F.3d 61, 64-65 (2d Cir. 1996). No independent grounds exist to suppress statements made during the local police and FBI questioning.[9]

---

[9] As for defendant's motion to suppress the statements he made to Special Agent Ward en route to the courthouse for arraignment, there are no grounds for suppression. The interrogations were over, defendant having invoked his right to counsel. Ward had not asked defendant any questions or made any comments to elicit the statements from defendant. Defendant made spontaneous statements about the predicament in which he found himself, and Ward simply responded that the matter was already in the courts.

As defendant's rights were not violated in the car by Ward, suppression of statements defendant made to Ward on the way to the courthouse is denied. <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981) ("an accused . . . having expressed his desire to deal with the police only through

### III.  CONCLUSION

For the above reasons, defendant's motion to suppress his statements made at the jetway questioning is granted.  Defendant's motion to suppress his statements made at the local police questioning and the FBI questioning is denied.  Defendant's motion to suppress statements he made to the FBI en route to the courthouse is denied.

SO ORDERED.

Dated: Brooklyn, New York
       June 6, 2005

_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

---

counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").